IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 8, 2025 Session

## STATE OF TENNESSEE v. GREGORY LIVINGSTON

**Appeal from the Criminal Court for Shelby County**
No. 21-03582     Chris Craft, Judge
_____

### No. W2024-01087-CCA-R3-CD
_____

A Shelby County jury convicted Defendant, Gregory Livingston, of first degree premeditated murder for which he received a sentence of life imprisonment. On appeal, Defendant challenges (1) the sufficiency of the evidence supporting the conviction; (2) the admission of the autopsy report prepared by a non-testifying forensic examiner and testimony from a medical examiner who did not conduct the autopsy; (3) the admission of a video recording from a police officer's body camera showing the victim's girlfriend crying following the shooting; and (4) the admission of Defendant's statement that he previously killed others. Upon review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Phyllis Aluko, Shelby County Public Defender; and Barry W. Kuhn and Tony Brayton, Assistant Shelby County Public Defenders (on appeal); Leslie Ballin, Memphis, Tennessee (at trial); and Steven Farese, Ashland, Mississippi (at trial), for the appellant, Gregory Livingston.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General Pro Tem; and David Jones and Ronald Dowdy, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural History

On August 7, 2021, Defendant, a security guard at a Kroger gas station in Memphis, Tennessee, and the victim, Alvin Motley, engaged in an altercation at the gas station during which Defendant shot and killed the victim. Defendant was subsequently charged with first degree premeditated murder. The case proceeded to trial in April 2024.

According to the evidence presented at trial, on August 7, 2021, the victim and his girlfriend, Pia Foster, arrived in Memphis from their home in Chicago, Illinois, intending to visit the victim's family, as well as Beale Street. They arrived in Memphis around 8:00 a.m., visited a friend of the victim, ate at a restaurant, and checked into their hotel at around 3:00 p.m. Ms. Foster testified that at approximately 6:00 p.m., they went to the Kroger gas station. Ms. Foster was driving, and the victim, who had issues with his vision, sat in the front passenger's seat. Ms. Foster exited the vehicle to pump gas. She explained that due to the victim's vision issues, he was unable to maneuver the gas nozzle into the vehicle's gas tank without assistance.

Ms. Foster testified that the music from her vehicle was loud and that a security guard, who she later identified as Defendant, approached her as she was pumping gas and "hollered" for her to turn down the music. She stated that she initially did not hear what Defendant had said and that while "words were exchanged" during the encounter, she did not recall what those words were. She acknowledged that she told Defendant, "Leave us the f*** alone. You don't know what type of day we're having." She described Defendant as "[h]ostile" and believed he was "picking on" her. Ms. Foster stated that the victim turned down the music and asked her to whom she was talking after which "words were exchanged between all three of us."

While Ms. Foster was pumping gas, the victim twice exited the vehicle, "exchang[ed] words" with Defendant, and reentered the vehicle. She did not recall hearing the victim threaten to "kick [Defendant's] a**" or threaten to kill Defendant. She stated that at one point, she walked up to the victim and told him, "Come on. Let's get in the car." Ms. Foster explained that she was attempting to deescalate the situation, but she agreed that her "hollering out and calling everybody mother f***ers" did not "calm the situation down." She agreed that her actions, her words, and the volume of her voice did not improve the situation, but she did not know whether her actions affected the victim's actions.

After Ms. Foster paid for the gas, she backed up her vehicle in an attempt to leave, and "[m]ore words were exchanged between the victim and Defendant. She did not know

- 2 -

that Defendant had called 911.  The victim exited the car and stated his intention to talk to Defendant "like a man."  Ms. Foster testified that no weapons were inside her car and that to her knowledge, the victim did not have any weapons on his person.  As the victim approached Defendant, Ms. Foster saw Defendant brandish a weapon, which she believed at the time to be a taser.  She did not recall Defendant raising his hand and telling the victim to "please back up."  She said that Defendant pointed the weapon at the victim and fired and that the victim fell to the ground.

Ms. Foster exited her vehicle and approached the victim, who she believed at that time had been tased.  After seeing the victim on the ground, Ms. Foster returned to her vehicle and retrieved her cell phone to call 911 while Defendant was "[j]ust standing there."  Ms. Foster returned to the victim whose clothes were "saturated" with blood and attempted chest compressions.  A person employed in the medical field assisted Ms. Foster in attempting to render aid to the victim.  Ms. Foster spoke to police officers once they arrived at the scene.  She was shown a photographic lineup but was unable to identify the shooter due to her emotional state.  She identified Defendant at trial as the shooter.

Police officers obtained surveillance videos from two video cameras at Kroger.  According to the footage, Ms. Foster and the victim arrived at the gas station at approximately 6:44 p.m., and the shooting occurred at approximately 6:49 p.m.  The videos depicted Defendant approaching Ms. Foster and speaking to her shortly after Ms. Foster and the victim arrived and while Ms. Foster was pumping gas into her vehicle.  Defendant initially walked away from the vehicle but then returned, and video from a camera facing the passenger side of Ms. Foster's vehicle showed Defendant arguing with Ms. Foster and the victim while the victim was inside the vehicle.  Ms. Foster acknowledged that the demeanors of herself, the victim, and Defendant were "hostile" during the entire exchange.

At approximately 6:46 p.m., the victim exited the vehicle and approached Defendant, and they argued.  The cashier exited the building and spoke to the victim and Defendant.  Ms. Foster approached, grabbed the victim, and led him toward her vehicle.  Ms. Foster turned around, argued with Defendant and the cashier, and pushed the victim toward the vehicle.  At 6:47 p.m., the victim reentered the vehicle on the passenger side while Ms. Foster returned to the gas pump.  A few seconds later, the victim exited the vehicle a second time and approached Defendant, and they continued to argue.  Ms. Foster pushed the victim toward the vehicle while he and Defendant argued.  At approximately 6:48 p.m., both Ms. Foster and the victim reentered the vehicle, and the cashier reentered the building.  Shortly thereafter, the vehicle backed up while the argument continued.  At approximately 6:49 p.m., the victim exited the vehicle and approached Defendant, who pointed a gun at the victim.  Ms. Foster identified a can of beer and a cigarette in the victim's hands after he exited the vehicle and approached Defendant.  The victim took a few additional steps toward Defendant; Defendant fired his gun; and the victim fell to the

ground. The video showed Ms. Foster's attempt to render aid to the victim while Defendant stood nearby.

On cross-examination, Ms. Foster acknowledged that the victim drank beer and smoked marijuana on the day of the shooting, but she did not know how many cans of beer that the victim had consumed. She denied that either she or the victim took ecstasy. She understood that an autopsy was conducted on the victim's body and that a toxicologist had tested the victim's blood for foreign substances. However, she continue to deny that she and the victim had taken ecstasy.

The State also presented the recording of Defendant's 911 call made at approximately 6:46:55 p.m., a few minutes prior to the shooting. Defendant reported that a combative person was at the gas station and gave a description of the victim. The operator asked whether any weapons were involved, and Defendant replied, "Not yet." During the call, someone was heard yelling, "You back the f*** off. I mean it," following by a gunshot shortly thereafter. People were heard screaming, and someone said he was on the telephone with 911. The 911 operator transferred the call to a representative from the fire department, who questioned Defendant regarding the victim's condition. Defendant reported that the victim had been shot in the chest and that he was "semi coherent." However, he did not answer other questions regarding the victim's condition posed by the representative.

Meredith Moore testified that she was at the gas station at the time of the shooting. As she was pumping gas, Ms. Foster and the victim pulled up to a pump located on the other side of a brick column and approximately ten to twelve feet away from Ms. Moore. Music was coming from the vehicle, and Defendant, the security guard, approached the vehicle and told the occupants to turn down the music. Defendant, Ms. Foster, and the victim argued, but Ms. Moore was unable to hear everything that was said. She recalled hearing Ms. Foster say, "Leave us alone. Leave us the f*** alone." Ms. Moore recalled hearing Ms. Foster and the victim curse but did not recall whether Defendant cursed. Ms. Moore did not recall the victim saying, "You don't know what we're capable of," but she did recall the victim threatening to "kick [Defendant's] a**." She agreed that the victim appeared inebriated and "unstable" in that "he had stumbled out of the car."

Ms. Moore began recording the altercation on her cell phone, and the recording was played to the jury. The view in the recording was blocked by the brick column, but screaming and cursing was heard on the recording. A woman, who Ms. Moore identified as Ms. Foster, yelled, "Leave us the f*** alone," and Ms. Foster later yelled, "Come on," "Let's go," and "Get in the car." Ms. Moore testified that the cashier came outside and attempted to calm everyone, and a man was heard in the recording stating, "Calm down. It's Saturday. It's a great day." Ms. Moore stopped recording once the situation

- 4 -

deescalated. Ms. Moore testified that as Ms. Foster was backing up her vehicle, "it seem[ed] that something else was said" by Defendant, and the victim exited the vehicle again. Ms. Moore resumed recording the altercation, and a gunshot was heard in the recording. Ms. Moore identified Defendant as the shooter, and she did not hear Defendant telling the victim to "[b]ack the f*** down" prior to the shooing. She stated that she did not recall seeing a weapon in the victim's hands prior to the shooting and that she did not know what the victim was holding. Ms. Moore did not see the victim physically assault Defendant, take a "fighting stance" against Defendant, or raise his hand into a fist in an effort to punch Defendant. Following the shooting, Ms. Moore did not see Defendant render aid to the victim.

Kierra Daugherty testified that she and her boyfriend, Shedrick Weary, were at the gas station at the time of the shooting. When they arrived, Mr. Weary exited the vehicle to make a purchase while Ms. Daughtery remained inside the vehicle. Ms. Daughtery stated that Ms. Foster and the victim parked at a gas pump adjacent to where Ms. Daughtery was parked, and Ms. Foster exited the vehicle to pump gas. Ms. Daughtery recalled that the music from the vehicle was loud and that a security guard approached them and told them to turn off the music. Ms. Foster and the victim questioned why they had to turn off the music, and the victim and the security guard began arguing. Ms. Daughtery did not recall what was said during the argument. Once Ms. Foster finished pumping gas into her vehicle, she tried to persuade the victim to reenter the vehicle so that they could leave.

Ms. Daughtery stated that once Ms. Foster and the victim reentered the vehicle, Ms. Foster drove in reverse as if they were leaving the premises. Ms. Daughtery believed the situation had been resolved and began looking down at her cell phone. When she looked up from her cell phone, she saw that the vehicle was parked, that the passenger's side door was opened, and that the victim and the security guard were standing "face to face" and approximately five to ten feet away from each other. The security guard was pointing a gun at the victim, and Ms. Daughtery did not know whether the victim had anything in his hands. Ms. Daughtery was scared and closed her eyes. She heard a gunshot, opened her eyes, saw the victim on the ground, and saw the security guard walk away to the other side of the cashier booth. She did not hear anyone shout a warning prior to the shooting. She said the security guard did not render aid to the victim. Ms. Daughtery exited her vehicle to check on Mr. Weary, called 911, and waited for the police to arrive. She identified the shooter in a photographic lineup, but she was unable to identify the shooter at trial.

Josias Gomez was at the gas station at the time of the shooting. He testified that as he was pumping gas into his vehicle, he heard a woman loudly arguing with a cashier and another man. He said he did not hear everything that was said but that he recalled the woman saying, "I am a customer; pay with cash." Mr. Gomez stated that he saw the victim, who seemed upset, walking back and forth and exchanging words with Defendant. Mr.

Gomez acknowledged that he did not have a clear understanding of the argument's subject matter. Mr. Gomez recalled the woman telling the victim to "just get in the car." He stated that after the woman and the victim got into their car and as they were driving away, Defendant seemed to have been "provoking" them. When asked to explain how Defendant was "provoking" them, Mr. Gomez testified that "the couple was leaving already at that point. They were already driving off and some words were exchanged and the person got out." The victim exited the vehicle and approached Defendant, who then shot him. Mr. Gomez testified that the victim was holding a beverage can and did not have a weapon prior to the shooting, and Mr. Gomez did not hear the victim say anything immediately before he was shot. He stated that the victim did not engage in violence, punch Defendant, or attempt to or threaten to strike Defendant with a weapon. Mr. Gomez did not remain at the scene following the shooting but later sent an email describing the events to the lieutenant in charge of the investigation.

Shedrick Weary testified that he was at the gas station with Ms. Daugherty when he saw Ms. Foster and the victim pull up and park at the opposite end from where Mr. Weary and Ms. Daughtery had parked. Mr. Weary heard music coming from the vehicle and saw Defendant, the security guard, tug on his belt "like a cowboy would tug on his pants," approach the vehicle, and tell Ms. Foster in an "aggressive" tone to turn down the music. Mr. Weary exited his vehicle and stated that the music was not bothering him. Mr. Weary stated that the victim "came to the defense," exited the vehicle, and became involved in a verbal altercation with Defendant. According to Mr. Weary, Defendant and the victim each called the other a "b***h" and threatened to "whoop" the other's "a**." At that point, the altercation did not turn physical.

Mr. Weary testified that after the initial verbal altercation and when the victim reentered his vehicle, Defendant approached Mr. Weary and stated that "he's killed people before in the past and that he wasn't worried about whatever they just got . . . into about." Mr. Weary stated that he "brushed [Defendant] off and told him I didn't care about anything he was saying. I wasn't trying to hear none of that." Mr. Weary testified that Defendant made the statement "in passing," and Mr. Weary believed "that was him deescalating himself [from] the situation by saying that to me, . . . [and] that's why I brushed it off like, okay, bro, whatever." Although Mr. Weary acknowledged that he was uncertain of exactly when Defendant made the statement, Mr. Weary stated that Defendant had to have made the statement after he and the victim exchanged threats to "whoop" the other's "a**."

The victim exited the car as it was backing up. Mr. Weary stated that the victim was holding a cigarette in one hand and a beer in the other hand and that the victim did not have a weapon. Mr. Weary saw Defendant "[g]etting in his stance, reaching for his gun." Defendant then shot the victim, "put his hands up," and "walked away." Ms. Foster was screaming and crying and attempted to render aid to the victim, and someone called 911.

On cross-examination, Mr. Weary acknowledged that during the preliminary hearing, he testified that Defendant made a statement regarding prior killings as the victim and Ms. Foster were in their vehicle backing away from the gas pumps. Mr. Weary testified that Defendant likely made the statement to him before Defendant called 911, and defense counsel informed Mr. Weary that his testimony was not consistent with his testimony at the preliminary hearing. Mr. Weary responded that he was "wrong" regarding "that information" and that "[i]f the timeline doesn't line up, then I guess you can put that on me, but he still said what he said." Mr. Weary testified that he overheard Defendant having a telephone conversation with someone through his AirPods prior to the shooting, but Mr. Weary was unsure whether Defendant continued with the telephone call after the shooting occurred. Mr. Weary acknowledged that prior to trial, one of the prosecutors informed him that Defendant was talking to the police through his AirPods, and Mr. Weary agreed that this information led him to change his prior testimony from the preliminary hearing regarding when Defendant made the statement about previously killing others. On redirect examination, Mr. Weary testified that the prosecutor never told him to change his statement.

Zypourah Richardson arrived at the gas station as Defendant and the victim were arguing, and she remained inside her vehicle during the incident. Ms. Richardson testified that the tones of Defendant and the victim were equal, that the victim's voice was "escalated slightly," that the victim "didn't have a real angry type of demeanor," and that "nobody was super aggressive." She heard a woman raising her voice "[s]lightly" and stating to "leave them alone; they were just pumping gas." Ms. Richardson stated that the woman and the cashier were attempting to "diffuse the situation," and the woman was telling the victim to get into the vehicle. Ms. Richardson did not hear the woman use profanity. Ms. Richardson recalled hearing the victim call Defendant a "b***h," but she did not hear the victim threaten to kick Defendant's "a**." She stated that she was not afraid for her life during the argument and that she was not concerned that the victim might carry out an act of violence.

Ms. Richardson testified that the victim exited the vehicle while the vehicle was backing up and walked toward Defendant. Although she could not recall the victim's exact words, she said the victim stated something to the effect of "just let me speak to you." Ms. Richardson testified that Defendant made a "command," but she could not recall what Defendant said. She acknowledged that she told police officers that Defendant told the victim to stop. She was "shocked" when Defendant shot the victim because she did not believe the argument was "that serious." She did not believe Defendant gave the victim the opportunity to stop before Defendant shot him; she could not recall the number of steps that the victim took after Defendant told him to stop; and she stated that "[f]rom when he

gave the command to when he shot him was quick." Ms. Richardson remained at the scene following the shooting and gave a statement to police.

Officer Brandon Talford of the Memphis Police Department ("MPD") was the first officer to arrive at the scene. He testified that he received a call of a disturbance at the Kroger gas station that was upgraded to a shooting. When Officer Talford arrived at the scene, he saw the victim lying on the ground while surrounded by several people and a woman doing chest compressions. He said Ms. Foster was "hysterical" and "shocked." Officer Talford saw blood coming from the right side of the victim's body and on his arm, and the victim did not have a pulse. Officer Talford called for an ambulance and additional police officers and rendered aid to the victim to the best of his ability until other assistance arrived.

Officer Talford testified that he overheard what appeared to be a verbal altercation between Defendant and another man. Officer Talford stated that the man was making statements similar to "You shot him, you shot him," and Defendant was "rebutting back to him." Officer Talford told Defendant to be quiet and to step away from the man. Officer Talford stated that Defendant appeared frustrated and as if he was trying to "distance hi[m]self away from the scene."

MPD Lieutenant Matt Herbert was the second officer to arrive at the scene. He disarmed Defendant and recovered a firearm, two magazines, two knives, asp or expandable baton, and a cell phone from him. Lieutenant Herbert placed Defendant in the back of a police car. Lieutenant Herbert also asked Ms. Foster to sit in a separate police car so that she could be questioned later. A portion of the video from Lieutenant Herbert's body camera was admitted and played to the jury showing Lieutenant Herbert's search of Defendant and Lieutenant Herbert's asking Ms. Foster to sit in the back of a police car as Ms. Foster cried.

Defendant's firearm was identified as a Glock nine-millimeter firearm, and a spent casing that was on the ground and recovered by officer was identified as a nine-millimeter casing. Officers also located an empty beer can on the ground. Keys, a lighter, and a package of cigarettes were found in the victim's pockets. Although officers did not search the vehicle in which the victim was a passenger, they did not observe any weapons in plain view inside the vehicle.

Dr. Marco Ross, an expert in forensic pathology, testified regarding the autopsy of the victim performed by Dr. Scott Collier, who was no longer with the West Tennessee Regional Forensic Center at the time of trial. Dr. Ross reviewed the one-page investigation report by the county medical examiner, the five-page autopsy report prepared by Dr.

Collier, and the documentation reflecting the analysis of the victim's blood performed by NMS Labs in Pennsylvania.

Dr. Ross testified that according to Dr. Collier's autopsy report, Dr. Collier found that the victim sustained two gunshot wounds, one to his chest and one to his right forearm. Regarding the gunshot wound to the chest, the bullet entered the victim's right front chest region, passed through the right lung, and transected the spinal cord, and the bullet was recovered from the spinal canal. Regarding the gunshot wound to the arm, the bullet entered the back outer portion of the right forearm above the wrist and exited through the inner front portion of the forearm above the wrist. Dr. Ross stated that the range of fire was described as indeterminate. He stated that Dr. Collier included a comment in the autopsy report that although the victim sustained two separate gunshot wounds, the wounds could have been caused by a single bullet. Dr. Ross explained that if the victim's arm was positioned in front of his chest, the bullet could have entered and exited through the forearm and then entered the chest. Dr. Ross stated that according to the "summary and interpretation" portion of the autopsy report, the cause of the victim's death was a gunshot wound to his chest and that the manner of death was homicide.

Dr. Ross testified that according to the laboratory report, the victim had 221 milligrams per deciliter of ethanol in his blood, which is the equivalent of a .221 on the breathalyzer scale. Dr. Ross stated that the effects of alcohol are dependent upon the individual's tolerance, that an infrequent drinker would be "quite intoxicated" at that level, and that a "regular drinker" may function "fairly normally" at that level. According to Dr. Ross, the victim was "[m]ore likely than not" experiencing some effects on his physical and mental abilities at the time of his death due to his alcohol intake.

Dr. Ross testified that testing of the victim's blood also showed the presence of 3,4-Methylenedioxymethamphetamine (MDMA), commonly known as ecstasy, and three compounds related to cannabinoids or marijuana use. He agreed that the victim likely smoked marijuana at some point and that based upon the levels in his blood, he smoked marijuana likely within twenty-four hours of his death if he was an infrequent user or about one to two days prior to his death if he was a chronic user. Dr. Ross could not determine whether the marijuana was impairing the victim's physical or mental abilities at the time of his death based upon the levels in his blood, and Dr. Ross explained that the extent of impairment would depend upon the level of the victim's tolerance and usage. Dr. Ross also could not determine whether the MDMA had any effect on the victim's physical or mental abilities. He noted that because MDMA has a "fairly long" half-life, the drug can take "quite a while" to break down in a person's body, and he was unable to determine when the victim last used the drug. Dr. Ross stated that the victim possibly could have ingested the drug twenty-four hours prior to his death and that if so, the victim likely would not have been feeling the effects of the MDMA at that time of his death.

On cross-examination, Dr. Ross testified that MDMA has both stimulant and hallucinogenic properties and that potential effects of the drug include agitation and paranoia. He stated that when a stimulant is combined with a depressant such as alcohol, the effects may cancel out each other. He said that a "fairly low" level of MDMA was present in the victim's blood and that the effect of the MDMA "might be a little more prominent" if the victim was not accustomed to taking MDMA but had a high tolerance level for alcohol. Dr. Ross stated that although the effects of alcohol vary, alcohol could release social inhibitions so that the drinker becomes more aggressive.

Megan Thomas, a digital specialist with the District Attorney General's Office in Nashville, prepared a compilation of the video and audio evidence presented at trial. She noted that Defendant shot the victim within seconds of his telling the victim, "Back the f*** up, I mean it." She acknowledged that the victim took approximately four steps after Defendant gave the command and before Defendant shot him.

The State rested its case, and Defendant chose not to testify or to offer any other proof. The jury convicted Defendant of first degree premeditated murder, and the trial court imposed a term of life imprisonment. Defendant filed a timely motion for new trial, which the trial court denied following a hearing. Defendant then filed a timely notice of appeal.

## II. Analysis

On appeal, Defendant challenges (1) the sufficiency of the evidence supporting the conviction; (2) the admission of the autopsy report prepared by a non-testifying forensic examiner and testimony from a medical examiner who did not conduct the autopsy; (3) the admission of a video recording showing Ms. Foster crying following the shooting; and (4) the admission of Defendant's statement that he previously killed others.

### A. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support his conviction for first degree premeditated murder. He argues that the evidence failed to establish that he acted with intent to kill and with premeditation and that the evidence, instead, reflected that he acted in self-defense. The State responds that the evidence sufficiently established intent and premeditation and that the jury properly concluded that Defendant did not act in self-defense. We agree with the State.

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13(c). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id*. at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

Under Tennessee Code Annotated section 39-13-202(a)(1), first degree murder is the "premeditated and intentional killing of another." As applicable to the instant case, a person acts intentionally "when it is the person's conscious objective or desire to cause the death of the alleged victim." *State v. Reynolds*, 635 S.W.3d 893, 915 (Tenn. 2021) (citing Tenn. Code Ann. § 39-11-302(a) (2018)). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(e).

Whether premeditation exists is a question of fact for the jury "which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also Reynolds*, 635 S.W.3d at 916. The Tennessee Supreme Court has identified a non-exhaustive list of specific circumstances that suggest the existence of premeditation:

    (1) The use of a deadly weapon on an unarmed victim;

    (2) The particular cruelty of the killing;

- 11 -

(3) Threats or declarations of the intent to kill;

(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (citing *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017); *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013); *State v. Kiser*, 284 S.W.3d 227, 268-69 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *Bland*, 958 S.W.2d at 660). The jury, as the trier of fact, "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim 'after the exercise of reflection and judgment.'" *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e)). Thus, premeditation "may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment.'" *Leach*, 148 S.W.3d at 53 (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e)).

The trial court instructed the jury on self-defense. Tennessee Code Annotated section 39-11-611(b) provides in pertinent part that

(1) . . . [A] person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right

- 12 -

to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) . . . [A] person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death, serious bodily injury, or grave sexual abuse;

(B) The danger creating the belief of imminent death, serious bodily injury, or grave sexual abuse is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *See* Tenn. Code Ann. § 39-11-201(a)(3); *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). Whether the defendant acted in self-defense is a matter for the determination of the jury as the trier of fact. *State v. Dooley*, 29 S.W.3d 542, 547 (Tenn. Crim. App. 2000); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

The evidence presented at trial, when viewed in the light most favorable to the State, established that Defendant shot and killed the unarmed victim during a verbal altercation. The altercation began when Defendant approached Ms. Foster and told her to turn down the music in her vehicle. Ms. Foster described Defendant as "[h]ostile," and Mr. Weary described Defendant's tone in issuing the instruction as "aggressive." Defendant continued to engage with the victim in the verbal altercation during which Defendant and the victim each called the other a "b***h" and threatened to "whoop" the other's "a**." Mr. Weary testified that during a break in the verbal altercation, Defendant told him that "he's killed people before in the past" and that he "wasn't worried." When Defendant called 911 and reported a combative person, the operator asked whether any weapons were involved, and Defendant replied, "Not yet." A jury could reasonably conclude that based on Defendant's statements, he was contemplating the use of deadly force during a break in the verbal altercation and before he pulled a gun on the victim.

Rather than walking away, Defendant continued to engage in a verbal altercation with the victim while Ms. Foster and the victim were attempting to leave. Ms. Moore testified that Defendant "seemed" to have said "something else" to the victim and Ms.

- 13 -

Foster as they were attempting to leave, and Ms. Foster testified that Defendant and the victim "exchanged words" as she and the victim were in their vehicle attempting to leave. The victim exited the vehicle, telling Ms. Foster of his intent to only talk to Defendant. Ms. Richardson testified that once the victim exited the vehicle, he made a statement to the effect of "just let me speak to you." The victim was not holding a weapon but held a can of beer in one hand and a cigarette in the other hand. Defendant pulled his gun, pointed it at the victim, yelled at the victim to "back the f*** off," and shot the victim within seconds of the command and without affording the victim the opportunity to comply with the command. Multiple witnesses testified that prior to Defendant's shooting the victim, the victim did not make any aggressive moves toward Defendant and did not appear to reach for a weapon. Although Defendant was on the telephone with a 911 operator when he shot the victim, Defendant provided limited information regarding the victim's condition, threw up his hands, and he stood around the victim's body while others attempted to render aid. When Officer Talford arrived at the scene, Defendant appeared to be in a verbal altercation with another man regarding the shooting during which Defendant attempted to "distance hi[m]self away from the scene."

The trial court instructed the jury on self-defense, and the jury rejected Defendant's claim of self-defense, which was within the purview of the jury as the trier of fact. *See Dooley*, 29 S.W.3d at 547; *Goode*, 956 S.W.2d at 527. We conclude that the evidence, when viewed in the light most favorable to the State, was sufficient to establish Defendant's intentional and premeditated killing of the victim. Therefore, the evidence is sufficient to support Defendant's conviction for first degree premeditated murder.

## B. Admission of the Autopsy Report and the Medical Examiner's Testimony

Defendant asserts that the admission of the autopsy report prepared by a forensic pathologist who did not testify at trial and the admission of Dr. Ross's testimony about the autopsy violated his state and federal constitutional right to confront witnesses against him. Although Defendant did not object to the admission of the autopsy report and Dr. Ross's testimony at trial, Defendant asserts that he is entitled to plenary review because his claim is based on the United States Supreme Court's opinion in *Smith v. Arizona*, 602 U.S. 779 (2024), which was decided after Defendant's trial but prior to the hearing on his motion for new trial, and because he raised the issue in his motion for new trial. Defendant argues that in any event, he is entitled to relief under plain error review. The State responds that Defendant waived plenary review by failing to object at trial and that Defendant failed to establish that he is entitled to relief under plain error review. We agree with the State.

"One of the bedrock constitutional protections afforded to criminal defendants is the Confrontation Clause of the Sixth Amendment, which states: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'"

*Hemphill v. New York*, 595 U.S. 140, 150 (2022) (quoting U.S. Const. amend. VI); *Pointer v. Texas*, 380 U.S. 400, 403 (1965) (holding "that the Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment"); *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008) ("The fundamental right of confrontation applies through the Fourteenth Amendment to the states."). Similarly, article I, section 9 of the Tennessee Constitution guarantees the right to confrontation, providing "[t]hat in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face." Tenn. Const. art. I, § 9. Even though the language of the two constitutional provisions differs, our supreme court has "expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." *State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014) (citations omitted); *see also Cannon*, 254 S.W.3d at 301.

The Confrontation Clause "protects a defendant's right of cross-examination by limiting the prosecution's ability to introduce statements made by people not in the courtroom." *Smith v. Arizona*, 602 U.S. 779, 784 (2024). "The Clause's prohibition 'applies only to testimonial hearsay.'" *Id.* (quoting *Davis v. Washington*, 547 U.S. 813, 823 (2006)). "To implicate the Confrontation Clause, a statement must be hearsay ('for the truth') and it must be testimonial—and those two issues are separate from each other." *Id.* at 800.

At the time of Defendant's trial, the determination of whether the admission of an autopsy report prepared by a forensic pathologist who did not testify at trial and the admission of another expert's testimony about the autopsy was controlled by our supreme court's opinion in *State v. Hutchison*, 482 S.W.3d 893 (Tenn. 2016), *abrogated in part by Smith v. Arizona*, 602 U.S. 779 (2024)). In *Hutchison*, our supreme court provided a framework for determining whether an autopsy report is testimonial based on the varying standards for determining whether a statement is testimonial set forth by the United States Supreme Court in the majority, concurrent, and dissenting opinions in *Williams v. Illinois*, 567 U.S. 50, 84, 113-17, 123-25 (2012). *See Hutchison*, 482 S.W.3d at 910. Our supreme court stated:

> [W]e will look first to whether the autopsy report satisfies the broad standard advocated by the four dissenting Justices in *Williams*, under which a statement would be deemed testimonial if its primary purpose is to prove past events potentially relevant to a criminal prosecution. Once past that threshold, we will consider whether: (1) the autopsy report has "indicia of solemnity" as set forth in Justice Thomas's separate concurrence in *Williams or* (2) the primary purpose of the autopsy report was to accuse a targeted individual, in accordance with Justice Alito's plurality in *Williams*.

- 15 -

*Id.* (citing first *Williams*, 567 U.S. at 84-85, 110-11; and then *Davis*, 547 U.S. at 822; and then *Dotson*, 450 S.W.3d at 67-68; and then *Young v. United States*, 63 A.3d 1033, 1043-44 (D.C. 2013)) (emphasis in original). "If the autopsy report meets the threshold standard and either of the latter two standards, it is considered testimonial within the meaning of the Confrontation Clause." *Id.* at 910-11.

In *Hutchison*, our supreme court concluded that the autopsy report met the threshold standard, that "the circumstances objectively indicate[d] that the autopsy report was 'meant to serve as evidence in a potential criminal trial.'" *Id.* at 911 (quoting *Williams*, 567 U.S. at 138 (Kagan, J., dissenting). However, the court also concluded that the autopsy report "lack[ed] the formality and solemnity of an affidavit, deposition, or prior testimony, as described by Justice Thomas in his *Williams* concurrence." *Id.* at 912. Finally, the court concluded that the circumstances did not indicate that the autopsy report was "'made for the purpose of proving the guilt of a particular criminal defendant at trial.'" *Id.* at 914 (quoting *Williams*, 567 U.S. at 84). The court agreed that "'an autopsy report prepared in the normal course of business of a medical examiner's office is not rendered testimonial merely because the . . . medical examiner performing the autopsy is aware that police suspect homicide and that a specific individual might be responsible.'" *Id.* (quoting *People v. Leach*, 980 N.E.2d 570, 593 (Ill. 2012)). Thus, the court held that the autopsy report was not testimonial and that its admission did not violate the defendant's rights under the Confrontation Clause. *Id.*

The court also addressed the defendant's claim that the expert's testimony based on the autopsy report violated his rights under the Confrontation Clause because the expert did not perform the autopsy. *Id.* The court noted that the defendant's argument "falls by the wayside" due to the court's conclusion that the admission of the autopsy report did not violate the defendant's confrontation rights. *Id.* The court also noted the following excerpt from the plurality opinion in *Williams* that

> [w]hen an expert testifies for the prosecution in a criminal case, the defendant as the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rest are not offered for their truth and thus fall outside the scope of the Confrontation Clause.

*Id.* (quoting *Williams*, 567 U.S. at 58). The court also cited to authority that "'the Confrontation Clause is not violated when an expert testifies regarding his or her independent judgment, even if that judgment is based upon inadmissible testimonial hearsay.'" *Id.* (quoting *State v. McLeod*, 66 A.3d 1221, 1230 (N.H. 2013)); *see id.* at 914-

15 (citing cases). Thus, the court concluded that the expert's testimony did not violate the defendant's confrontation rights. *Id.* at 915.

Here, the record reflects that during opening statements, defense counsel argued that Defendant shot the victim after the victim engaged in threatening behavior, and defense counsel referenced the autopsy, stating, "The autopsy will help you to know why he was acting—[the victim] was acting the way he was acting." Defense counsel questioned Ms. Foster extensively on cross-examination regarding the victim's use of alcohol, marijuana, and ecstasy and, again, referenced the autopsy. As a result of the questioning, Ms. Foster acknowledged that she understood that an autopsy had been performed and that as part of the autopsy, the victim's blood was tested for foreign substances, but Ms. Foster maintained that the victim had not taken ecstasy.

Before the State called Dr. Ross as a witness as trial, the trial court held a hearing outside the jury's presence during which the State announced its intention to introduce the autopsy report but sought to exclude the laboratory results of testing of the victim's blood that was conducted by an independent laboratory. Defense counsel argued for the admission of the results of the blood tests, asserting that the laboratory results were part of the autopsy file upon which Dr. Ross relied in rendering an opinion. Defense counsel stated that Dr. Ross will "effectively be reading from a report. And what I hear the State say is, 'We just want him to be able to read from part of the report.'" The trial court granted Defendant's request and allowed the entire autopsy report, including the laboratory report to be entered into evidence.

Defense counsel questioned Dr. Ross extensively on cross-examination regarding the substances that were in the victim's blood, the amounts, and the possible effects. Defense counsel relied on the results of the blood tests during closing arguments to assert that Defendant acted in self-defense. Defense counsel argued that "[w]e've got .22 on his alcohol content; we've got THC, which admittedly if you believe Ms. Foster they had. We've got MDMA, alcohol, THC" and he argued that the victim "was out of control. I don't know if it was the effects of the drugs [or] the alcohol or the combination of both."

On May 3, 2024, the jury returned a verdict convicting Defendant of first degree premeditated murder, and the trial court sentenced Defendant to life imprisonment. On May 14, Defendant filed a motion for new trial in which he raised multiple issues but did not challenge the admission of the autopsy report or Dr. Ross's testimony.

On June 21, 2024, the United States Supreme Court released its opinion in *Smith v. Arizona*, 602 U.S. 779 (2024), which concerned a Confrontation Clause challenge to the admission of an expert's testimony conveying statements in a drug analysis report prepared by a non-testifying analyst in support of the expert's opinion. *Smith*, 602 U.S. at 783, 790-

92. In *Smith*, the defendant was charged with multiple drug offenses as the result of officers' discovery of what appeared to be drugs and drug-related items while executing a search warrant. *Id*. at 789. By the time of trial, the analyst who tested the drugs no longer worked for the laboratory, and the State did not call her as a witness at trial. *Id.* at 790. Instead, the State presented a "substitute expert," who reviewed the laboratory report, testified regarding what the document stated, and provided an opinion regarding the chemical nature of the substances. *Id.* at 791. In reviewing the defendant's Confrontation Clause challenge, the court concluded that the laboratory report prepared by the non-testifying analyst met the hearsay requirement in that the out-of-court statements in the report were admitted "for their truth." *Id.* at 792-93, 798. The Court held that "[i]f an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Id.* at 795. The Court rejected the State's claim that the statements in the laboratory report were admitted not for their truth but to show the basis of the testifying expert's independent opinion in accordance with the applicable rule of evidence. *Id.* at 793-94. The Court concluded that "'[t]here is no meaningful distinction between disclosing an out-of-court statement' to 'explain the basis of an expert's opinion' and 'disclosing that statement for its truth.'" *Id.* at 795 (quoting *Williams*, 567 U.S. at 106 (Thomas, J., concurring in judgment)).

However, the Court declined to address whether the out-of-court statements were testimonial because the defendant did not raise the issue in his petition for certiorari and the lower courts did not address the issue. *Id.* at 799-801. The Court remanded that issue to the Arizona Court of Appeals but "offer[ed] a few thoughts" based on the parties' arguments. *Id.* at 801. The Court noted that the determination whether a statement is testimonial "focuses on the 'primary purpose' of the statement, and in particular on how it relates to a future criminal proceeding." *Id.* at 800. The Court stated that a court must "identify the out-of-court statement introduced, and must determine, given all the 'relevant circumstances,' the principal reason it was made." *Id.* at 800-01 (quoting *Bryant*, 562 U.S. at 369). As it related to the circumstances in *Smith*, the Court stated that the reviewing court first must determine which of the non-testifying expert's out-of-court statements were at issue. *Id.* at 801. Then, in addressing the primary purpose of the statements—"why [the non-testifying expert] created the report or notes"—the Court said that the reviewing court "should consider the range of recordkeeping activities that lab analysts engage in." *Id.* The Court noted that some records from a laboratory analyst may not have an "evidentiary purpose" and, therefore, are not testimonial, such as laboratory records that are prepared primarily to "comply with laboratory accreditation requirements or to facilitate internal review and quality control" or an analysts' notes that are "written simply as reminders to self." *Id.* The Court stated that to qualify as testimonial, "the document's primary purpose must have 'a focus on court.'" *Id.*

Following the release of *Smith*, Defendant filed a supplemental motion for new trial in which he challenged the admission of the autopsy report and Dr. Ross's testimony regarding the report as violating his confrontation rights. In denying Defendant's motion for new trial, the trial court found that any error in the admission of the evidence was harmless.

On appeal, Defendant acknowledges that he did not object to the admission of the autopsy report or Dr. Ross's testimony at trial. However, he maintains that he is entitled to plenary review because he raised the issue in his motion for new trial and "[t]he issue should not be considered waived if it is included in the motion for new trial." Defendant further argues that his failure to object at trial does not preclude plenary review on appeal because his claims are based on a change in the law that was not recognized until after trial.

"Appellate review generally is limited to issues that a party properly preserves for review by raising the issues in the trial court and on appeal." *State v. Minor*, 546 S.W.3d 59, 65 (Tenn. 2018) (citing Tenn. R. Crim. P. 51; Tenn. R. Evid. 103(a)-(b); Tenn. R. App. P. 3(e); 13(b), 27(a)(4), 36(a); *State v. Bledsoe*, 226 S.W.3d 349, 353-54 (Tenn. 2007)). "Issue-preservation requirements promote efficiency and judicial economy by 'enabl[ing] a trial court to avoid or rectify an error before a judgment becomes final' and 'fostering the expeditious avoidance or correction of errors before their full impact is realized.'" *State v. Bristol*, 654 S.W.3d 917, 926 (Tenn. 2022) (quoting *Minor*, 546 S.W.3d at 65; and then citing *State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020)). This obligation to preserve issues applies to both constitutional and non-constitutional issues. *Minor*, 546 S.W.3d at 65 (citing *United State v. Olano*, 507 U.S. 725 (1993)). Issue preservation begins with "a timely and specific objection in the trial court either at or before trial." *State v. Reynolds*, 635 S.W.3d 893, 926 (Tenn. 2021) (Tenn. R. Evid. 103(a); *Vance*, 596 S.W.3d at 253). An objection must state "the specific ground of objection if the specific ground was not apparent from the context[.]" Tenn. R. Evid. 103(a)(1).

Our supreme court has recognized that plain error review rather than plenary review applies to a defendant's claim that the admission of evidence violated his constitutional right to confront witnesses when the defendant raised the issue in his motion for new trial but failed to object to the admission of the evidence on this basis at trial. *Vance*, 596 S.W.3d at 253-54. Furthermore, the release of an opinion changing the law while a defendant's case is pending on direct review does not alleviate a defendant's obligation to comply with appellate review preservation requirements. *See Minor*, 546 S.W.3d at 70 (holding that application of a new constitutional rule to cases pending on direct review when the new rule is announced is subject to "existing jurisprudential principles, such as appellate review preservation requirements and the plain error doctrine" and that "if a defendant fails to comply with appellate review preservation requirements, an appellate court must utilize the plain error doctrine rather than plenary appellate review when

applying a new rule"). Because Defendant failed to object to the admission of the autopsy report and Dr. Ross's testimony regarding the report as violating his confrontation rights, he has waived plenary review of the issue on appeal. However, Defendant also maintains that the admission of the evidence constitutes plain error.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Five factors must be met before this court will conclude that plain error exists:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted)). All five factors must be established before this court will recognize plain error and "'complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.'" *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (quoting *Smith*, 24 S.W.3d at 283). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016)).

The record establishes that not only did Defendant fail to object to the autopsy report and Dr. Ross's testimony, but that Defendant affirmatively argued for the admission of the toxicology report as part of the entire file of the victim's autopsy. Defense counsel referenced the autopsy report and the results of blood tests showing a large amount of alcohol, as well as marijuana and ecstasy in the victim's blood, as evidence that the victim engaged in threatening behavior and that Defendant shot him in self-defense. Given defense counsel's argument seeking admission of the toxicology report as part of the entire autopsy file and defense counsel's references to and utilization of the information during opening statements, in cross-examining witnesses at trial, and during closing arguments in support of Defendant's self-defense claim, we cannot conclude that Defendant "'did not waive the issue for tactical reasons.'" *See Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.3d at 641-42).

We also conclude that consideration of the error is not "'necessary to do substantial justice.'" *Id.* (quoting *Adkisson*, 899 S.W.3d at 641-42). There is no serious question that

Defendant shot the victim. Numerous video recordings showed Defendant shooting the victim once during an altercation, and multiple witnesses testified that the victim was unarmed and was holding a beer can and a cigarette when Defendant shot him. The autopsy report and Dr. Ross's testimony regarding the report merely confirmed that the victim's death was caused by a gunshot wound, and Defendant did not challenge his identity as the shooter or the cause of the victim's death at trial. Under these circumstances, granting relief is not necessary to do substantial justice. *See Dotson*, 450 S.W.3d at 72 (concluding that granting relief regarding the admission of autopsy reports prepared by a non-testifying pathologist and the testimony of an expert witness about the reports was not necessary to do substantial justice when the witness testified as an expert without objection from the defense, the defendant did not challenge the causes of the victims' deaths or any other conclusions in the reports on in the expert's testimony, and the autopsy reports and the expert's testimony did not implicate the defendant).

Because Defendant failed to establish that he did not waive the issue for tactical reasons or that consideration of the alleged error is necessary to do substantial justice, we need not determine whether the admission of the autopsy report and Dr. Ross's testimony regarding the report breached a clear and unequivocal rule of law. *See State v. Martin*, 505 S.W.3d at 504 (providing that consideration of all five plain error factors is unnecessary when the record clearly demonstrates that at least one of the factors cannot be established). Defendant has failed to establish plain error—therefore, he is not entitled to relief under the plain error doctrine.

### C. Admission of Recording from Body Camera

Defendant contends that the trial court erred in admitting a video recording taken from the responding officer's body camera showing Ms. Foster crying following the shooting. Citing Tennessee Rules of Evidence 401, 402, and 403, Defendant argues that the recording was irrelevant and unfairly prejudicial. Defendant acknowledges that he has waived plenary review of the issue by failing to raise the issue in his motion for new trial. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. App. P. 3I ("Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence ... or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). However, he maintains that he is entitled to relief under the plain error doctrine. The State responds that Defendant failed to establish that he is entitled to relief under the plain error doctrine. We agree with the State.

At trial, the State sought to admit a portion of a video recording from Lieutenant Herbert's body camera showing him searching and disarming Defendant and placing him in the back of a patrol car. The recording also showed Ms. Foster crying and yelling while officers attempted to calm her. Defendant objected to the admission of the recording as irrelevant and unfairly prejudicial and argued that Ms. Foster's statements in the recording were inadmissible hearsay.

The State responded that the defense had attacked Ms. Foster's credibility and that the recording was relevant to establish the trauma that Ms. Foster experienced because of the shooting, which may have affected her ability to recall some of the details. The State also argued that the recording was relevant to show how the scene appeared in the aftermath of the shooting and that Ms. Foster's statements were made immediately after the shooting while she was experiencing the stress and trauma from the shooting. The State noted that the recording was several hours long and that the State was seeking only a few minutes of it, approximately one minute of which was Ms. Foster crying and talking about the shooting. The trial court granted the State's request to admit the portion of the video recording but ordered the State to redact several of Ms. Foster's statements.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence that is not relevant is inadmissible. Tenn. R. Evid. 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm. Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted). Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

The video recording was relevant to establish how the scene appeared following the shooting, Defendant's demeanor, and Ms. Foster's emotional state to explain her lapses in memory. The State presented only a short portion of the video recording from the officer's body camera, and the trial court ordered the State to redact some of Ms. Foster's statements regarding the shooting before the court admitted the recording into evidence. The record

supports the trial court's rejection of Defendant's challenges to the admission of the recording under Tennessee Rules of Evidence 401 and 403 and the trial court's decision to admit the evidence. Therefore, Defendant has failed to establish that the admission of the evidence breached a clear and unequivocal rule of law. *See Smith*, 24 S.W.3d at 282.

Defendant also failed to establish that consideration of the alleged error is "'necessary to do substantial justice'" in light of other video evidence and testimony from witnesses presented at trial regarding Ms. Foster's behavior both before and after the shooting. *Id.* (quoting *Adkisson*, 899 S.W.2d at 641-42). This court has recognized that "only rarely will plain error review extend to an evidentiary issue." *State v. Haymer*, 671 S.W.3d 568, 578 (Tenn. Crim. App. 2023) (citation omitted). Defendant contends that the State utilized the recording during closing arguments to elicit sympathy from the jury. The record reflects that the State played a video during closing arguments and stated, "Remember that voice that cried, that guttural, deep pain." However, the record does not otherwise identify the video that was played. Nevertheless, the record reflects that Defendant objected, arguing that the State was "eliciting sympathy from this jury," and that the trial court immediately instructed the jury to refrain from allowing sympathy or prejudice from influencing the verdict. The jury is presumed to follow the trial court's instructions. *See State v. Rimmer*, 623 S.W.3d 235, 263 (Tenn. 2021); *State v. Harbison*, 539 S.W.3d 149, 163 (Tenn. 2018).

Accordingly, Defendant has failed to establish that the trial court's decision in admitting the video recording rose to the level of plain error. Defendant is not entitled to relief on this issue.

### D. Admission of Defendant's Statement

Defendant challenges the trial court's decision to admit Mr. Weary's testimony that prior to the shooting, Defendant stated that "he's killed people before in the past and that he wasn't worried about whatever [Defendant and the victim] just got . . . into about." Citing to Tennessee Rule of Evidence 404(b), Defendant asserts that (1) the State was required to prove that he committed the other killings by clear and convincing evidence and that (2) the evidence was unfairly prejudicial. The State responds that the evidence was not subject to Rule 404(b) and that, regardless, the trial court did not abuse its discretion in admitting the evidence.

During a hearing outside the jury's presence prior to Mr. Weary's testimony at trial, the State announced its intention to present evidence that Defendant told Mr. Weary that he was not afraid of the victim and that he had previously killed four people. The State argued that the evidence was relevant to Defendant's intent and whether Defendant was in fear of death or serious bodily injury when he shot the victim. Defense counsel agreed that

- 23 -

the State had accurately summarized the proposed testimony but argued that the evidence otherwise failed to meet the requirements of Rule 404(b).

As a result of defense counsel's agreeing that the State accurately summarized the proposed testimony, the trial court found that the State was not required to establish during the jury-out hearing that Defendant made the statement. The court found that evidence that Defendant told someone that he had previously killed others was relevant to the issue of his intent to kill the victim. In examining the prejudicial effect of the evidence, the court noted that the statement was that of a "party opponent" and that there was no evidence that Defendant was convicted of the prior killings or that the prior killings were otherwise unlawful. The court further noted that "it may have been a justifiable killing, or he may have just been saying that just to say it and bragging as it were." The court found that the probative value of the evidence was not outweighed by any unfair prejudice.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Rule 404(b) has been described as a rule of exclusion rather than inclusion. *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). "Trial courts have been encouraged to take a 'restrictive approach of [Rule] 404(b) . . . because "other act" evidence carries a significant potential for unfairly influencing a jury.'" *Id*. (quoting *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)).

Evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme," or contextual background. *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013), *abrogated on other grounds by State v. Thomas*, 687 S.W.3d 223 (Tenn. 2024); *see* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Evidence may be admitted for these purposes if the following requirements have been met:

(4) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

If the trial court has substantially complied with the procedure mandated by Rule 404(b), a trial court's decision to admit or exclude evidence pursuant to Rule 404(b) is reviewed under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court abuses its discretion when "'it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence or utilizes reasoning that results in an injustice to the complaining party.'" *Jones*, 450 S.W.3d at 892 (quoting *State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013)). If the trial court has failed to substantially comply with the procedural mandates of Rule 404(b), our standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-53).

The State argues that the evidence of Defendant's statement was not subject to Rule 404(b). We note that the State did not seek to present evidence that Defendant actually killed others previously but that he only stated that he had done so. The State presented Defendant's statement as evidence of his state of mind prior to his shooting the victim and of his intent in shooting the victim.

In *State v. Tunstall*, this court addressed whether Rule 404(b) was applicable to the admission of evidence in a trial on charges of attempted second degree murder and aggravated assault of statements made by the defendant, including a statement threatening to shoot the victim "like I did your brother" when the State did not offer the evidence to prove that the defendant actually committed the uncharged crime but to prove that he made the statement as part of the assault and attempt to kill the victim. No. W2014-00257-CCA-R3-CD, 2015 WL 1089742, at *9-14 (Tenn. Crim. App. Mar. 10, 2015). This court has noted that other jurisdictions have upheld the admission of a defendant's statements of a threat or an intention to commit the criminal offense for which the defendant was on trial that included an admission or reference to other acts of the defendant but that the jurisdictions differed on whether Rule 404(b) controlled the admissibility of such statements. *See Tunstall*, 2015 WL 1089742, at *9-11 (discussing cases).

As an example of jurisdictions that declined to apply Rule 404(b), this court in *Tunstall* cited to *United States v. Mare*, 668 F.3d 35, 37-39 (1st Cir. 2012), where the defendant was convicted of arson for burning a business that he owned for insurance benefits, the court upheld the admission of the defendant's statement of his intention to commit the arson just as he had committed on a prior occasion but determined that the admission of the statement was not controlled by Rule 404(b). *See Tunstall*, 2015 WL 1089742, at *11 (discussing *Mare*). The court in *Mare* reasoned that

In the typical 404(b) scenario, the evidentiary focal point is the existence of some bad conduct other than the charged offense. The concern is that, upon learning of that prior conduct, the jury might think worse of the defendant's character out of some "rel[iance] on the aphorism 'once a criminal, always a criminal.'" Here, by contrast, the focal point was the defendant's own statement concerning the charged offense itself—"I am going to do it the way I did it the last time." The fact that [the defendant] identified his plot with the uncharged offense sheds relevant light on his mindset in committing the charged offense. For example, as the district court suggested, it supported the government's case that he specifically intended to commit the charged arson in order to defraud, an element of the mail fraud statute under which he was charged. That reasoning does not depend on an inference regarding [the defendant]'s character for acting in conformity with a prior bad act. Indeed, it does not even depend on [the defendant]'s having actually committed the prior bad act at all. It depends only on [the defendant]'s having made the statement. Reasonable jurors could have made pertinent inferences based solely on [the defendant]'s bark, regardless of whether they believed that he had ever previously backed it up with his bite. [The defendant]'s words were therefore relevant for a reason other than, to borrow a familiar phrase from another evidentiary canon, the truth of the matter asserted.

*Mare*, 668 F.3d 35 at 38-39 (citations and footnote omitted).

In *Tunstall*, this court observed that "[p]revious cases from our supreme court suggest that such evidence should be properly considered evidence of other acts subject to Rule 404(b) under a broad view of the rule." *Tunstall*, 2015 WL 1089742, at *12. This court relied upon our supreme court's language in *State v. DuBose* that

[w]here the evidence of other crimes, wrongs, and acts may reflect upon the character of the accused, the procedure set forth in Rule 404(b) should be followed, even though the evidence is offered to prove a material fact not necessarily related directly to the accused. If, after hearing the evidence, the trial court finds that the evidence does not implicate the accused, the weighing of probative value against unfair prejudice will be made pursuant to Rule 403. If the court finds that the evidence reflects upon the character of the accused, the weighing will be made pursuant to Rule 404(b).

*Id.* (quoting *DuBose*, 953 S.W.2d at 655).

In *Tunstall*, this court noted that the defendant's threat to the victim of "I ought to shoot you in the head like I did your brother" appeared to implicate the defendant in the murder of the victim's brother and that, "therefore under the rule of *DuBose*, would constitute other act evidence that must be assessed under Rule 404(b), notwithstanding that the evidence was not offered to establish that [the defendant] did in fact commit the murder" of the victim's brother. *Id.* at *9, 12. This court concluded that it need not determine whether the evidence fell within the purview of Rule 404(b) because, regardless, the probative value of the evidence outweighed its prejudicial effect. *Id.* at *12.

We likewise conclude that even if Defendant's statement about killing others constituted other act evidence within the meaning of Rule 404(b), the trial court properly admitted the evidence. On appeal, Defendant does not challenge the trial court's finding that his statement was relevant as evidence of his intent. Rather, he contends that his statement should have been excluded because no evidence was presented to establish that he actually killed others previously and because the probative value of the evidence was outweighed by the danger of unfair prejudice.

"Where evidence of another act of a defendant is not being offered to prove that the other act actually occurred as the basis for an inference as to a defendant's guilt of the charged offense, the other act is not subject to the proof requirement of Rule 404(b)(3)." *Tunstall*, 2015 WL 1089742, at *14. In *State v. Smith*, 868 S.W.2d 561, 578 (Tenn. 1993), our supreme court upheld the admission of evidence in the defendant's trial on three counts of first degree premeditated murder that the defendant had pending charges aggravated assault of two of the victims at the time of the murders pursuant to Rule 404(b) as evidence of motive and intent while concluding that the State was not required to prove that the defendant actually committed the charged aggravated assaults by clear and convincing evidence. *Smith*, 868 S.W.2d at 578. The court stated that "[s]trickly speaking," the evidence did not constitute "other crimes evidence." *Id.* The court reasoned:

> The relevant fact was that the charges were pending, and exposed the Defendant, who knew of them, to possible prosecution and punishment regardless of their validity. Proof establishing the charges' truthfulness might have been relevant to increase the strength of the State's theory that avoiding prosecution and conviction was the Defendant's motive but was unnecessary to establish the admissibility of the outstanding warrants.

*Id.*; *see Tunstall*, 2015 WL 1089742, at *14 (upholding the admission of the defendant's threat to the victim that he would shoot him like the defendant did to the victim's brother and concluding that the State was not required to prove by clear and convincing evidence that the defendant actually murdered the victim's brother in order for evidence of the threat to be admissible).

- 27 -

Here, the relevant evidence was that prior to the shooting, Defendant claimed that he had killed others previously and, thus, was not worried about his altercation with the victim. The issue was not the truthfulness of his admission to killing others. Thus, the State was not required to prove by clear and convincing evidence that Defendant actually killed others previously for Defendant's statement to be admissible.

Evidence that prior to shooting and killing the victim, Defendant stated that he had killed others previously and was not worried about his altercation with the victim was highly probative to Defendant's intent in shooting the victim and to negate his claim of self-defense. We acknowledge that Defendant's statement to killing others carried a risk of unfair prejudice in that the admission of the statement risked the jury's misusing the statement for an improper purpose. *See Tunstall*, 2015 WL 1089742, at *13. Such a risk, however, was reduced because the State did not seek to present any detailed evidence of the prior killings to establish that Defendant actually committed the prior killings, "unlike typical evidence of other uncharged crimes." *See id.*

The record reflects that the trial court substantially complied with the procedure set forth in Rule 404(b). The trial court recognized the probative value of Defendant's statement on the issue of his intent in shooting the victim and the danger of prejudice of the admission of Defendant's statement, noted that the State was not seeking to establish the truth of Defendant's claim of killing others, carefully weighed the probative value of the evidence against its danger of prejudice, and found that the probative value of the evidence outweighed the danger of unfair prejudice. We conclude that the trial court did not abuse its discretion in admitting the evidence.

### III. Conclusion

Upon reviewing the record, the parties' briefs and oral argument, and the applicable law, we affirm the trial court's judgment.

s/ Matthew J. Wilson

MATTHEW J. WILSON, JUDGE